UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| DR. KATHY DYE, | ) | |
| | ) | Civil Action No. 2:19-CV-087-CHB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| THOMAS MORE UNIVERSITY, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

*** *** *** ***

This matter is before the Court on Defendant Thomas More University's Motion for

Summary Judgment [R. 36], and Plaintiff Kathy Dye's Motion for Partial Summary Judgment

[R. 50]. The parties have filed respective response and reply briefs to the pending motions [R.

53; 54; 57; 58], and the motions are now ripe for resolution. For the reasons explained below, the

Court will deny TMU's Motion for Summary Judgment and grant Dye's Motion for Partial

Summary Judgment.

## I. Background

Plaintiff Kathy Dye was a tenured faculty member at Thomas More University (TMU)

and taught classes in the MBA and education programs. Dye began teaching at TMU in 1997 and

received tenure in 2009. For the 2014-2015 academic year, one of Dye's colleagues, Dr. Anne

Busse, was appointed chair of the department that Dye worked in. Prior to this, Dye and Busse

had no problems in their working relationship. [R. 40 p. 9, 200; R. 29 p. 47] According to Dye, a

couple interactions with Busse that year caused Dye to feel increasingly anxious toward Busse.

[R. 29 p. 79] In the summer of 2015, Busse completed a "Faculty Evaluation" of Dye and under

1

"suggestions for improvement" Busse noted a "lack of collegiality and cooperation," evidenced by faculty members commenting that Dye came across as "frosty" or "argumentative" and Busse suggested Dye work on being "more courteous and friendly." [R. 29-1 p. 22] Busse also criticized Dye's communication ("inconsistent," "unnecessarily vague," "delve[s] into distracting minutia") and noted that Dye had "missed four of ten department meetings," although two were excused. [*Id.* p. 22] The evaluation noted her strengths ("very knowledgeable and passionate about her subject matter," "cares about each student's learning," "has leadership talent") as well as various other problems or incidents that had occurred and, in Busse's opinion, indicated some need for improvement. [*Id.* pp. 21-23] Ultimately, Busse recommended that Dye continue as a tenured faculty member. [*Id.* p. 23] In August 2015, Dye and Busse met to discuss the evaluation. [R. 32-1 p. 1] This evaluation, in turn, led Dye to experience even more extreme anxiety towards Busse, particularly with respect to bi-weekly department meetings that Busse organized and chaired, and that nearly all of Dye's colleagues attended. Nevertheless, following the meeting to discuss Dye's evaluation, she attended that month's department meeting, but missed the next one, held two weeks later, on September 9. [R. 31-1 p. 2] After missing that meeting, Dye visited a nurse practitioner (Ms. Shelby Thornton, APRN) who wrote her a letter stating that Dye was experiencing anxiety "caused from situations that occur within her work department, including attending of meetings and some interpersonal communication with co workers." [R. 30 p. 1]

On September 21, 2015, Dye sent an email to Busse and Dean Kathleen Jagger (also the Vice President of Academic Affairs) defending herself from many of the "criticisms" Busse had outlined in the evaluation and informing Busse and Jagger that "[t]his triggers extreme anxiety for me. Dean Jagger witnessed an example of this anxiety on 26 August 2015, before a

department meeting." [R. 32-1 p. 2] The next day, she sent Dean Jagger the letter from her nurse practitioner, Ms. Thornton. [R. 32-2] When the next department meeting came around, on September 23, Dye emailed Busse and Dean Jagger early in the morning, reporting she had woken up "well before my alarm with a pounding headache and racing heart - manifestations, I believe, of anxiety about meeting (or not meeting) expectations about behavior at today's department meeting. I am also concerned about missing too many department meetings, so I plan to attend." [R. 32-3] And she did attend that meeting, as well as the next one. [R. 31-1] The morning of the next department meeting on November 4, Dye emailed Busse and Dean Jagger, reporting that she had lost sleep "because of anxiety about attending today's department meeting" and she was "troubled by the fact that I must subordinate personal health and well-being to meet the expectations of current department leadership" or else be "penalized," and she wanted to schedule a meeting with both of them "to resolve this problem." [R. 32-4] The next day, Dye emailed Dean Jagger again, telling her that "[t]wo things are high on my priority list," which were "[d]iscussion with you and Anne [Busse] about the extreme anxiety she triggers" and her "performance review for the 14-15 academic year." [R. 32-6]

About a week later, Dean Jagger apparently had not responded because Dye resent the email, explaining "I sent this last week, but cannot tell if you received it. I'm re-sending with delivery confirmation. It is important to me to resolve the issues noted below. The anxiety has increased, and it has started to generalize beyond department meetings and interactions with Anne. Please let me know next steps." [R. 32-10] A few days later, on November 13, she met with Dean Jagger and, in a follow-up email to Dean Jagger and Laura Custer (the Director of Human Resources) Dye reported that her and Dean Jagger had discussed "generalities about the tension between Anne Busse and me and the anxiety she triggers" and to only "further

compound [Dye's] anxiety," Dean Jagger had told her that the letter from Ms. Thornton "was not sufficient to document the medical nature of my anxiety." [R. 32-11] Dye was now quite concerned that she had "missed several recent department meetings . . . because of my anxiety"[1] but did not have "sufficient" medical documentation to excuse her for those absences and requested "clear guidance on next steps" to resolve the situation. [*Id.*] That evening, Dean Jagger responded but did not provide any requested "guidance on next steps," although she did mention that Dye's file contained "no recommendations for accommodations from any health providers." [R. 31-22 p. 2]

On the morning of November 18, Dye emailed Busse and Dean Jagger, again reporting that she was "awake long before my alarm because of anxiety about how I might be perceived at the department meeting" later that day and that her "anxiety affects my behavior at the meeting and my health" and she had gotten "insufficient sleep – because of anxiety about the meeting" but would try to attend anyway, and she did. [R. 32-13; R. 31-1 p. 2] The morning of the next scheduled department meeting, on December 2, Dye emailed Busse, Jagger, and Custer, informing them that she had been "awake for several hours trying to deal with a severe headache and other physical difficulties" and that she would not be attending the meeting, but if she needed to provide a medical statement to be excused then she would schedule an appointment with her doctor. [R. 32-15] The next day, Dye, Dean Jagger, and Custer met to discuss the issue of Dye's anxiety surrounding the department meetings and Busse. [R. 32-17] In a follow up email, Custer provided Dye with some guidance on "the type of information that health care providers give employers to help with understanding a condition or a request for an accommodation." [R. 32-19 p. 4] Over the next few weeks, Dye followed up multiple times

---

[1] The attendance sheets in the record indicate that, at this point in time, Dye had missed two of the five department meetings held that fall semester. [R. 31-1 p. 2]

asking questions, seeking clarification on certain details, and expressing more anxiety over the ongoing "uncertainty." [R. 32-19; 32-20] Dye continually expressed a request for some kind of "protection" from any negative consequences for having missed past and potentially missing future department meetings. [R. 32-20 p. 1; 32-21 p. 1]

On December 17, Dye visited Ms. Thornton and Dr. Asha Sharma, who wrote a note explaining the physical manifestations of Dye's mental condition and requested the "following accommodations to prevent anxiety and panic attacks: flexibility to not attend departmental meetings when symptoms of anxiety and panic attacks are present" and that they "anticipate the duration of the accommodations to be indefinite." [R. 30 p. 2] Dye provided the note to Dean Jagger on January 13, 2016, [R. 32-23] and Custer and Jagger responded, denying the accommodation request because it was "indefinite" in duration and, instead, required Dye to attend a "fitness for duty" examination the next week to "get a second opinion." [R. 32-24] On January 20, 2016,[2] Dye met with Dr. Davies who recommended that she be evaluated by a mental health professional, Dr. Tom Davis. [R. 30 p. 3]

In the meantime (while waiting for her appointment with Dr. Davis), Dye inquired on February 2, 2016, with Dean Jagger and Custer as to whether she would still be expected to attend department meetings and whether she had any "protection" before completing the mental evaluation. [R. 32-25] Jagger and Custer responded, stating TMU's "institutional response" to her questions (as well as other related requests Dye had raised earlier) and explicitly denied her accommodation requests, taking the position that attendance at the department meetings were an "essential function" and that until TMU could "verify with a second opinion" they were "unable to guarantee any protection against failing to complete the essential duties of the job." [R. 32-25

---

[2] Dye missed the January 20th department meeting because it conflicted with the "fitness for duty" examination that Dean Jagger and Custer had scheduled for her. [R. 32-24]

p. 3] Dye responded that she had thought they were starting a "collaborative discussion to resolve a very difficult situation" but she was "disappointed that this discussion doesn't seem to be a possibility." [R. 32-25 p. 1] When Dye explicitly asked to be excused from the February 3rd department meeting, Dean Jagger responded that "we can't continue to allow this accommodation until you complete the process in which we are currently engaged. It is your choice to be absent." [R. 32-26]

On February 17, Dye visited Dr. Jeff Blau who wrote a note that Dye was "suffering an acute panic attack" and that Dye needed to be off work for the next ten days. [R. 30 p. 4] At that point, Dye took leave under the Family and Medical Leave Act (FMLA) until April 6, 2016.[3] During this period of leave, she had her medical examination with Dr. Davis, a psychologist, and on March 1, 2016 he formally requested an accommodation that Dye "be absent from departmental meetings, at her own discretion, for the next six months or specifically until the beginning of the next academic year." [R. 30 p. 7] He also stated that "[d]uring this period of accommodation" he "recommend[ed] mediated meeting(s) between [Dye] and department chair to promote frank yet collegial understanding of the problems between them and potential resolutions." [R. 30 p. 7] On March 4, Dr. Davies (the doctor TMU originally scheduled for Dye to visit) agreed with Dr. Davis's opinion and accommodation request. [R. 30 p. 8] On March 21, 2016 (while still on FMLA leave) Dye emailed Dean Jagger and Custer to ask if "we have resolution to the request for 'reasonable accommodation'?" and "[i]f we don't have resolution, do we have a timeline and/or next steps?" [R. 32-33] On March 30, Dean Jagger emailed Dye to inform her they had received Dr. Davis's psychological evaluation but that it was "insufficient"

---

[3] On February 29, Dr. Blau extended her leave through March 13 and on March 10 Dye met with her therapist who further extended her leave. [R. 32-32; R. 30 p. 9-10] While on FMLA leave, Dye was presumably excused for missing the February 17 and March 16 department meetings because TMU forbid her from working.

6

and the "purpose of the evaluation . . . was to determine whether you are able to perform an essential function . . . attending all department meetings" and the report "does not address this specific subject." [R. 32-34 p. 2] Therefore, according to Dean Jagger, TMU could not "evaluate" whether she could perform this "essential function" and Dye needed to submit "sufficient documentation." [*Id.*] On April 1, Dye forwarded this request to Dr. Davis. [R. 32-35] On April 6, Dye reiterated her question on the "status" of her reasonable accommodation request and received no response. [R. 32-36] Dye missed the next department meeting, held on April 13th. [R. 31-1 p. 2] Then, on May 10, 2016, Dean Jagger and Custer met with Dye and presented her with a memo detailing Dye's "workplace performance issues," stating that failure to improve would result in "future disciplinary action, up to and including termination of employment for cause." [R. 32-40 p. 2] With respect to her accommodation requests, it stated that TMU would now "accommodate [Dye] by allowing you to call in to any remaining department meetings prior to the start of the next academic year" and would hold mediated meetings between Dye and Busse "to improve this relationship during the period of accommodation." [R. 32-40 p. 3]

That summer, Commencement was scheduled for Saturday, May 14th. [R. 33-1] On May 13, Dye visited Dr. Neel Desai who wrote a note that Dye should "not attend commencement activities or any activities related to commencement activities" (i.e., graduation) which was held the next day and Dye did not attend but was marked "not excused." [R. 30 p. 11; R. 33-1] In June, Dye missed another department meeting because it conflicted with a scheduled doctor's appointment and Busse apparently excused Dye's absence, stating that "[a] doctor's appointment is considered an appropriate reason to a miss a meeting" and Dye should just use her "best judgment" to decide whether to reschedule her appointment. [R. 33-3] [4]

---

[4] The record does not indicate whether any other department meetings were held in June or July 2016.

7

In August, TMU scheduled a day-long event called "General Assembly" (also called "faculty development day") [R. 39 p. 172], on August 11th, which included department meetings. [R. 33-7] A couple days beforehand, on August 9, Dye met with her psychologist, Dr. Belvedere, who wrote her a letter reiterating Dr. Davis's recommended "work accommodation that would allow Dr. Dye to be absent from departmental meetings" and that Dye and Busse had not yet had any mediated meetings. [R. 30 p. 16] Because Dye was "still experiencing the symptoms identified in Dr. Davis' evaluation," Dr. Belvedere recommended that Dye "be permitted to be absent from the Assembly meeting this Thursday . . . and from departmental meetings for a period of six months afterwards[.]" [*Id.*] She sent Dr. Belvedere's note to Dean Jagger who responded, "you are not excused from General Assembly" because Dye would "not be anywhere near those who provoke your anxiety" and "[a]s for department meetings[,] we had a compromise solution in place – calling in to meetings." [R. 29-1 p. 56] Despite Dean Jagger's refusal to accept Dr. Belvedere's recommendation, Dye was absent from the General Assembly and was marked "not excused" and she did not attend the department meeting either [R. 33-6; R. 29-1 p. 55]

On August 13, Convocation was scheduled. [R. 33-9] However, the day before, on August 12, a mediated meeting was held between Dye and Busse where they discussed, with a mediator, what "barriers" existed in their working relationship and "solutions to overcome these barriers." [R. 29-1 p. 59] That same day, Dye saw Ms. Thornton who wrote her a note explaining that Dye had been placed on a "second medication" for her anxiety and she could not drive or work while taking this medication, although she could "manage minor work duties while she is at home." [R. 30 p. 17] She provided this note to Dean Jagger and emailed her to explain "[t]his means I will not be able to attend tomorrow's opening convocation." [R. 29-1 p. 61] Dean Jagger

apparently did not respond. Convocation was held, and Dye did not attend and was marked "not excused." [R. 33-9] Missing these campus events (graduation, General Assembly, and Convocation) and the August 11th department meeting on General Assembly day was apparently the "final straw" [R. 42 p. 50, 52], and Dean Jagger sent Dye a letter explaining that she was "referring this matter to the President of the College." [R. 33-12]

On August 24th, TMU President Armstrong sent Dye a letter terminating her employment contract with TMU immediately. [R. 33-13] On September 2, President Armstrong sent a second letter, detailing the specific grounds for Dye's dismissal and starting the "formal proceedings" to terminate her tenure, in accordance with the Faculty Policy Manual. [R. 33-14] As required by the Faculty Policy Manual, a faculty hearing committee was formed, a hearing was held where evidence and testimony was presented, and the hearing committee issued a unanimous decision *opposing* Dye's termination. [R. 29-1 p. 75] This decision was unacceptable to TMU, so President Armstrong "appealed" the hearing committee's decision to the Board of Trustees—a procedure Dye contends is not permissible under her contract and the applicable policies. [R. 33-19] After a "remand" from the Board for the hearing committee to reconsider, the hearing committee affirmed its decision. Thereafter, the Board of Trustees issued a "final decision," effectively overruling the hearing committee and concluding that "the facts warrant the termination of Dr. Dye." [R. 29-1 p. 81] Dye's employment was terminated. [R. 29-1 p. 83] Dye then sued TMU in federal court under the Americans with Disabilities Act and the Kentucky Civil Rights Act for failure to accommodate and discriminatory termination, as well as breach of contract. [R. 1] Following the close of discovery, TMU moved for summary judgment on all of Dye's claims [R. 36], and Dye moved for partial summary judgment on her breach of contract claim [R. 50].

9

## II. Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining a motion for summary judgment, a court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 265 (1986). The initial burden of establishing no genuine dispute of material fact rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Id.* The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may treat that fact as undisputed. Fed. R. Civ. P. 56(e).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Liberty Lobby*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. Such evidence creating a "genuine" issue must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 Fed. App'x 428, 444-45 (6th Cir. 2006).

## III. Analysis

Dye alleges three disability-related claims under the Americans with Disability Act, 42 U.S.C. § 12101 *et seq.*, and the Kentucky Civil Rights Act, Ky. Rev. Stat. § 344.020(a) *et seq.*[5] Dye's claims are for discriminatory discharge, failure to provide a reasonable accommodation, as required by the ADA and KCRA, and a failure to engage in the required "interactive process" used to understand an employee's disability and to develop an accommodation that would permit the employee to overcome any disability-related barriers and continue working. Dye also alleges breach of contract under state law with respect to the manner in which TMU terminated her employment contract.

### A. Failure to Accommodate

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). The statute defines "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodation would impose an undue hardship." *Id.* § 12112(b)(5)(A). An "otherwise qualified individual" is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds[.]" *Id.* § 12111(8).

---

[5] Both parties agree that the standards under the ADA and KCRA are the same. [R. 36-1 p. 11 n.1; R. 53 p. 9 n.7] Therefore, the Court's ADA analysis applies to the KCRA as well. *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 531-32 (6th Cir. 2015) ("Given this express statement of purpose in the KCRA itself [and] the Kentucky Supreme Court's statement that the KCRA is to be interpreted in accord with the ADA . . . the KCRA tracks the ADA.") *See also Barnett v. Cent. Kentucky Hauling, LLC*, 617 S.W.3d 339, 343 (Ky. 2021) (explaining Kentucky courts "consider the ADA when interpreting vague language in the KCRA"); *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 591 (Ky. 2003) ("The [KCRA] was modeled after federal law, and our courts have interpreted the Kentucky Act consistently therewith."); *Macy v. Hopkins Cty. Bd. of Educ.*, 429 F. Supp. 2d 888, 902 (W.D. Ky. 2006) ("Since the language in the disability discrimination provisions of the [KCRA] tracks the ADA, it should be interpreted consonant with that Act.")

"There are two ways that a litigant can prove discrimination—directly or indirectly— each with its own test;" namely, the "direct evidence" test and the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) used for indirect or circumstantial evidence. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). The Sixth Circuit has consistently held that a failure to accommodate claim "unavoidably involves direct evidence (the failure to accommodate) of discrimination because the employer necessarily relied on the worker's disability in making decisions." *Cash v. Siegel-Robert, Inc.*, 548 F. App'x 330, 334 (6th Cir. 2013) (cleaned up) (quoting *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 868-69 (6th Cir. 2007)); *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 614 (6th Cir. 2020) ("Failure to accommodate and failure to engage in an interactive process . . . are evaluated under the direct-evidence standard[.]"); *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (explaining plaintiff "purports to bring failure-to-accommodate claims based on both direct and indirect evidence" but "the familiar *McDonnell-Douglas* burden-shifting framework . . . does not apply.").

Further, although a claim for discriminatory discharge under the ADA is typically evaluated under the *McDonnell-Douglas* burden-shifting approach, when a failure to accommodate "leads to discharge for performance inadequacies resulting from the disabilities," that is considered direct evidence of discharge "because of" an employee's disability, in violation of the ADA. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 460 (6th Cir. 1997) (cleaned up); *see also Hostettler*, 895 F.3d at 853 (explaining termination due to "alleged problems with an already-in-place accommodation should involve the same direct standard of proof.").[6]

---

[6] As the Sixth Circuit explained in *Equal Emp. Opportunity Comm'n v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018), under the burden-shifting framework, "[a] defendant may use a legitimate, nondiscriminatory rationale

Therefore, to "prove failure to accommodate under the direct-evidence framework, a
plaintiff must show that: 1) she is disabled within the meaning of the ADA; 2) she is otherwise
qualified for the position and could perform the essential functions of the job, with or without
reasonable accommodation; 3) her employer knew or had reason to know about her disability; 4)
she requested an accommodation; and 5) her employer failed to provide the requested
accommodation. Once a plaintiff establishes a prima facie case, the burden shifts to the employer
to demonstrate that any particular accommodation would impose an undue hardship on the
employer." *O'Donnell*, 833 F. App'x at 614 (citing *Mosby-Meachem v. Memphis Light, Gas &
Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018)). There is no dispute over the last three
elements—TMU and Dye engaged in extensive communication about her mental condition, she
and her physicians repeatedly requested a specific accommodation, and TMU did not provide the
requested accommodation. Instead, TMU argues that Dye is not an individual with a disability
under the ADA, and that even if she is disabled, she is not qualified with or without a reasonable
accommodation. [R. 36-1] Dye argues that there is sufficient evidence in the record to raise a
genuine dispute as to both of these elements. [R. 53]

### 1. Whether Dye is an Individual with a Disability Under the ADA

Under the ADA, an individual is disabled if she has "a physical or mental
impairment that substantially limits one or more major life activities" or has "a record of such an
impairment," or is "regarded as having such an impairment." 42 U.S.C. § 12102(1). Congress
has directed courts to construe the definition of disability "in favor of broad coverage" and "to

---

as a shield against indirect or circumstantial evidence," of discriminatory discharge, such as a neutral policy that
provides the basis for termination. But "failing to provide a protected employee a reasonable accommodation
constitutes direct evidence of discrimination" and so a "neutral policy" used to terminate the employee provides the
employer with no defense. *Id.* Thus, performance issues that are caused by the employer's failure to provide an
accommodation (and that lead to termination) cannot be a nondiscriminatory reason for the termination and the
employer cannot escape liability. *Id.*

13

the maximum extent permitted by the terms of [the ADA]." *Id.* § 12102(4)(A). As the Sixth Circuit explained, this is "[i]n keeping with the remedial purposes of the [2008 amendments to the ADA] . . . because the primary concern of the ADA is 'whether covered entities have complied with their obligations and whether discrimination has occurred,' not whether an individual's impairment is a disability." *Hostettler*, 895 F.3d at 853 (quoting 29 C.F.R. § 1630.2(j)(1)(iii)). Therefore, "[t]he question of whether an individual meets the definition of disability . . . should not demand extensive analysis." 29 C.F.R. § 1630.1(c)(4). Further, an impairment that "substantially limits *one* major life activity need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C) (emphasis added). And "for cases on the margin, the Act includes a 'rule of construction' that tips in favor of coverage." *Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020).

Major life activities include, but are not limited to, the basic functions of living like seeing, hearing, eating, sleeping, speaking, breathing, learning, concentrating, thinking, communicating, and working, among others. 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(i)(1)(i). To determine whether a disability substantially limits one of these major life activities, the regulations instruct courts to compare the plaintiff's alleged limitations to "most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Additionally, "[a]n impairment need not prevent, or significantly or severely restrict . . . a major life activity" to be substantially limiting. *Id.* "Like the term 'major life activities,' '[t]he term substantially limits shall be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard," rather, it is meant to be a "lenient" one. *Hostettler*, 895 F.3d at 853-64 (quoting 29 C.F.R. § 1630.2(j)(1)(i)).

14

TMU argues that it undisputable that Dye does not even meet this lenient standard. [R. 36-1 pp. 12-13] However, as an initial matter, TMU seems to misunderstand Dye's claim and the required analysis under the ADA.[7] TMU argues that because Dye's anxiety does not "restrict[] her ability to work," and because she can "teach, meet with students, send emails . . . drive, grocery shop and exercise," Dye must not be disabled under the ADA. [R. 36-1 p. 14] But total or severe restriction in all or even several areas of life is not what the ADA requires. Dye need only have "a physical or mental impairment that substantially limits *one or more* major life activities[.]" 42 U.S.C. § 12102(1)(A) (emphasis). And "[a]n impairment need not prevent, or significantly or severely restrict . . . a major life activity" to be substantially limiting. 29 C.F.R. § 1630.2(j)(1)(ii). In other words, the limitation "can be something considerably less than a total loss of function in some area." *O'Donnell*, 833 F. App'x at 615.

Additionally, TMU focuses on the major life activity of "working" and suggests that because Dye's anxiety does not substantially limit this activity, she is not disabled. But, again, to be disabled under the ADA, Dye does not need to show that she is limited with respect to "working" if at least one other major life activity (such as sleeping, thinking, concentrating, etc.) is substantially limited. For example, the Sixth Circuit described in *Cardenas-Meade v. Pfizer, Inc.* a similar mistake that the district court made in that case. *Cardenas-Meade*, 510 F. App'x 367, 370 (6th Cir. 2013). The lower court had determined that the plaintiff was not disabled under the ADA "because her illness did not substantially limit the major life activity of working"

---

[7] TMU also states in its Motion for Summary Judgment that "[m]ajor life activities are activities that are of central importance to daily life," but this definition, found in the Supreme Court case of *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), was explicitly rejected by Congress in the 2008 amendments to the ADA. *Jenkins v. Nat'l Bd. of Med. Examiners*, No. 08-5371, 2009 WL 331638, at *3 (6th Cir. Feb. 11, 2009); *Hentze v. CSX Transportation, Inc.*, 477 F. Supp. 3d 644, 661 (S.D. Ohio 2020) (explaining that "Congress disagreed with that definition" and in "the findings and purposes section of the [2008 amendments], Congress expressly stated that the enactment was designed to overturn the holdings of cases like *Toyota*."); 29 C.F.R. § 1630.2(i)(2) ("[W]hether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'").

and because the "primary triggering event for [plaintiff's] illness 'occurred in the workplace'" the district court presumably thought the illness must then substantially limit "working." *Id.* Not so. The Sixth Circuit explained that "the fact that a triggering event occurs in the workplace should not dictate how a court considers the impact of an ailment on *non-work* major life activities." *Id.* Instead, a court must still look at whether the impairment limits the other listed major life activities. *Id.*; *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633 (6th Cir. 1998) ("An employee demonstrates disability for purposes of the ADA by showing a substantial limitation on a major life activity, not necessarily the major life activity of working."). TMU's argument that because Dye can still "work" (i.e., teach, correspond with students, etc.) she must not be disabled, is without merit.

Two additional things to note before examining the evidence—first, the fact that Dye's mental conditions and associated symptoms are "episodic makes no difference under the ADA. So long as the impairment 'would substantially limit a major life activity *when active*,' that is enough." *Hostettler*, 895 F.3d at 854 (quoting 42 U.S.C. § 12102(4)(D) (emphasis added)). So, for example, if a plaintiff is substantially limited in a major life activity "*when* [she is] experiencing her depression and anxiety. . . [t]hat is enough for her to be considered an individual with a disability under the ADA." *Id.* Second, TMU cites several cases that either predate the 2008 amendments to the ADA or explicitly apply the pre-2008 standards.[8] But the Sixth Circuit has explained that "Congress passed the ADA Amendments Act of 2008" in response to "years of court decisions narrowly defining who qualifies as an individual with

---

[8] *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 450-451 (6th Cir. 2004); *Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. P'ship*, 828 F. Supp. 2d 889, 911-912 (E.D. Ky. 2011) ("Defendant's alleged conduct and the date Plaintiff was fired took place before the amendments to the ADA went into effect . . ."); *Stover v. Amazon.com, LLC*, 442 F. Supp. 3d 971, 984 (E.D. Ky. 2020) (applying "the ADA's former definition of disability" and the pre-2008 ADA standards).

disabilities," and the congressional amendments "invalidate[d] those decisions" to "restore the intent and protections of the Americans with Disabilities Act." *Hostettler*, 895 F.3d at 848–49. Therefore, to the extent TMU "argues that pre-2008 cases are still good law in regard to determining whether a plaintiff was disabled," Congress and the Sixth Circuit has been unequivocal that "they are not." *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019).

The Court finds that the record contains extensive evidence that could support a finding that Dye is limited in one or more major life activity, such as sleeping, thinking, or concentrating. For example, during the independent medical evaluation conducted at the request of TMU, Dr. Davis performed tests with results that "suggest[ed] formal psychiatric diagnoses of Major Depression, Generalized Anxiety Disorder and Post Traumatic Stress Disorder superimposed over Obsessive Compulsive and Avoidant Personality traits." [R. 30 p. 6] [9] Further, Dr. Allen (TMU's medical expert) did not disagree with Dr. Davis's diagnostic conclusions. [R. 43 p. 52]

TMU argues that "simply having a medical diagnosis is not sufficient to establish a disability for the purpose of the ADA." [R. 36-1 p. 13] While that may be true, as explained below, Dye has more than just a diagnosis to support her claim of being disabled. Further, the ADA regulations include a list of specific impairments and explains that these impairments will "virtually always be found to impose a substantial limitation on a major life activity." 29 C.F.R. § 1630.2(j)(3)(ii). According to the regulations, "it should easily be concluded that . . . major depressive disorder . . . [and] obsessive compulsive disorder . . . substantially limit brain

---

[9] With respect to PTSD, Dr. Davis noted that he believed she did "not meet full criteria for [PTSD] but her history, behavior and symptoms do include elements" of PTSD. [*Id.*]

function[.]" *Id.* at § 1630.2(j)(3)(iii); *see also Williams v. AT & T Mobility Servs., LLC*, 186 F. Supp. 3d 816, 825 (W.D. Tenn. 2016) (explaining that "[t]he regulations, by using the words 'virtually always' and 'should easily be concluded,' create a strong presumption . . . that Plaintiff's severe depressive disorder and anxiety substantially affected a wide range of major life activities[.]").

With respect to the record, there is no shortage of evidence that Dye's mental conditions, when active, substantially limit one or more of her major life activities. For example, a December 17, 2015 medical note from Ms. Thornton, APRN, indicates Dye experienced "ongoing situational anxiety, and ongoing panic attacks that occur when she is required to attend departmental meetings" and that Dye "becomes incapacitated when she attends these meetings" with symptoms of shortness of breath, crying, nervousness, heart palpations, irregular breathing, and chest pain. [R. 30 p. 2] Dye described her anxiety as "debilitating." [R. 29 p. 20] A July 13, 2016 note from her visit with Dr. Nelson indicates Dye's anxiety can cause a "panic attack that lasts up to a day" and her "body tightens, stomach feels funny, arms feel cold and [she] gets headaches" and she experiences "insomnia when she is very anxious." [R. 30 p. 12] Further, Dye repeatedly reported to TMU administrators that her anxiety would cause a "pounding headache and racing heart" as well as significantly affect her sleep [R. 32-3; 32-4; R. 32-13; R. 32-15; R. 32-36] There is also evidence in the record that when she has anxiety her "brain" does not "function[] properly," it "stop[s] working," and "she can't think." [R. 29 p. 20; R. 32-40 p. 3; R. 32-41] Similarly, a doctor's note from Dr. Blau indicated that Dye was "suffering an acute panic attack" and was "unable to focus and [is] anxious." [R. 30 p. 4]

As the Court already explained, "[a]n impairment need not prevent, or significantly or severely restrict . . . a major life activity" to be substantially limiting. 29 C.F.R. §

1630.2(j)(1)(ii). In light of this record evidence, the Court cannot conclude, as a matter of law, that Dye's mental impairments do not substantially limit *any* major life activities, such as thinking, sleeping, or concentrating. Instead, Dye has pointed to more than sufficient evidence in the record to raise a genuine dispute as to whether she is an individual with a disability under the ADA, and this precludes summary judgment on this issue.[10]

### 2. Whether Dye is Otherwise Qualified for the Position

To be "qualified" under the ADA, a plaintiff must be able to "perform the essential functions" of the position "with or without reasonable accommodation." 42 U.S.C. § 12111(8). Therefore, a reasonable accommodation cannot involve "removing an 'essential function' from the position," for that is *per se* unreasonable. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015).

TMU argues that Dye is not qualified because she cannot perform the "essential functions" of 1) attending department meetings and campus events in-person,[11] and 2) interacting with her supervisor (Busse).[12] For this argument to succeed, the Court must conclude that there is no genuine dispute that each "function" is actually "essential" and that Dye cannot perform either.

---

[10] TMU also argues that because Dye's mental impairment is related to her interactions with her supervisor, she is not disabled, quoting *Woolf v. Strada*, 949 F.3d 89, 94 (2d Cir. 2020) (describing the "longstanding, common-sense principle of law [that] recognizes that employees who are precluded only from doing their specific job, or from working under a specific supervisor, do not have a 'disability.'") [R. 57 p. 5] However, the Second Circuit was explicitly (and only) addressing whether the plaintiff's claimed impairment substantially limited the major life activity of "working." *Id.* at 93. The Second Circuit explained that "the inability to perform a single, particular job" or work under a specific supervisor "does not constitute a substantial limitation in the major life activity of working" because to be limited with respect to "working," a plaintiff must be precluded from s "class or broad range of jobs." *Id.* at 95. And, of course, working with one supervisor is not a "class or broad range of jobs." Here, Dye has put forward evidence that her anxiety substantially limits *other* major life activities, such as sleeping, concentrating, and thinking. Therefore, *Woolf* is inapplicable.

[11] "Campus events" are those relevant to this case—graduation, General Assembly, and Convocation.

[12] Although TMU parenthetically quotes some cases that suggest an employee's inability to "get along" with his or her coworkers makes an employee unqualified for most jobs, TMU does not argue that Dye's alleged lack of "collegiality" or barriers to working with some of her colleagues made her unqualified.

"A job function is essential if its removal would fundamentally alter the position." *Mosby-Meachem*, 883 F.3d at 603 (quoting *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001). "Put another way, essential functions are the core job duties, not the marginal ones." *Hostettler*, 895 F.3d at 854 (citing 29 C.F.R. § 1630.2 (n)(1)). Whether a job function is essential "is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) (quoting *Keith v. County of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013)). Additionally, "this analysis does not lend itself to categorical rules—it is 'highly fact specific'" and must be "evaluated on a case-by-case basis by examining a number of factors." *Hostettler*, 895 F.3d at 854 (quoting *Mosby-Meachem*, 883 F.3d at 605); *O'Donnell*, 833 F. App'x at 615. The ADA and its regulations outline what those factors are: "the employer's judgment as to what functions of a job are essential," an employer's "written description" of the job, 42 U.S.C. § 12111(8), as well as:

> (1) the amount of time spent on the job performing the function;
> (2) the consequences of not requiring the incumbent to perform the function;
> (3) the terms of a collective bargaining agreement;
> (4) the work experience of past incumbents in the job; and
> (5) the current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(iii)-(vii). TMU relies almost entirely on the fact that in its own judgment, attendance at department meetings and campus events is an essential function, because TMU has said so by putting it in the employment contract and related policy manual, and its administrators have testified to the same throughout this litigation. Nevertheless, TMU's determination as to what functions are essential is only one of several considerations and does not necessarily carry greater weight than other factors. "The ADA states that the court should give 'consideration' to the employer's determination, not 'deference,' with the latter incorrectly implying that the employer's position creates a strong presumption in its favor. *Rorrer*, 743 F.3d

at 1042 (citing 42 U.S.C. § 12111(8)); *Ford*, 782 F.3d at 765 ("Our ruling does not . . . require blind deference to the employer's stated judgment" or "that whatever the employer says is essential necessarily becomes essential."). In other words, a function "is not an essential function of a job simply because an employer says that it is" and "[a]lthough the employer's judgment receives some weight in this analysis, it is not the end-all—*especially* when an employee puts forth competing evidence." *Hostettler*, 895 F.3d at 855 (citations omitted). And that is what Dye has done here, at least enough to survive summary judgment.

The Sixth Circuit has explained that determining "essential functions" "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Brown v. Chase Brass & Copper Co.*, 14 F. App'x 482, 489 (6th Cir. 2001) (citation omitted). Thus, take for example the "work experience of past incumbents in the job," and "the current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3)(vi-vii). TMU's President (Mr. Armstrong) Busse, Jagger, and Dye all testified that TMU had a long history of faculty not attending meetings or campus events, that enforcement of this supposed "requirement" was previously very "loose" (i.e., unenforced), and that only recently had the latest administration begin to strictly insist faculty attend these meetings and events. Dye testified in her deposition that "[f]or years and years at Thomas More College, we didn't even take attendance at department meetings. I don't know that anyone ever took attendance at . . . commencement or faculty general assembly. People missed meetings over and over and over again. And to the best of my knowledge, there were never any consequences." [R. 29 p. 30] President Armstrong's testimony corroborates Dye's—"[w]e had an issue with faculty not attending meetings, commencement, [and] General Assembly" and that is why TMU

put the attendance requirements in the faculty contract to spur faculty to start attending these events. [R. 44 p. 33]

Busse also testified that TMU's administration prior to Dean Jagger was a lot more "loose," and the "attendance issue was driven by the [new] administration," agreeing that the new administration was much stricter about attendance at department meetings. [R. 40 p. 29] Dye similarly reported, during a medical evaluation prior to litigation, that "while all professors at the college are under contract, prior to the most recent change in the department chair[,] the details of these contracts were loosely enforced." [R. 30 p. 5] Further, even after TMU's administration put it in the contract and became stricter in enforcing attendance, there is evidence in the record that exceptions to this "essential" requirement were made—one other faculty member missed six department meetings out of ten, yet Busse (the department chair that year) said she did not have any knowledge as to why that faculty member had missed six meetings. [R. 40 p. 23] Another faculty member's scheduled class time conflicted with the reoccurring departmental meeting, so he missed every single department meeting that year and Busse explained that they "had to make some kind of an exception somewhere along the way" since scheduling a convenient meeting time for all department faculty was not easy. [*Id.* p. 24]

Additionally, in Busse's opinion, missing meetings was ultimately not that big of a deal. Department meetings were canceled if "something else was going on," and when a faculty member missed a meeting, there was no "set procedure" for informing them of what they missed, rather faculty "would casually say, Hey, what did I miss[?]" when they got the chance to. [*Id.* p. 15] And missing parts of the meetings was acceptable, with some faculty occasionally arriving late or leaving early if needed [*Id.* p. 18] With respect to the campus events, multiple other faculty members did not attend graduation, General Assembly, and Convocation, with some

22

being "excused" and others not excused. [R. 33-1; R. 33-6; R. 33-9] At least one other faculty member missed all three of these events in 2016 and during her deposition, Dean Jagger stated that "this is the first time I've noticed that there were three non-excused absences" for that particular faculty member. [R. 42 p. 56-57] Furthermore, it was the unanimous opinion of five of Dye's colleagues that not attending graduation, General Assembly, or Convocation "did not impose a significant detrimental effect on the college or her department," [R. 33-18], which, viewed in a light most favorable to Dye, undercuts TMU's argument that attendance at these events is essential. Lastly, throughout the eight months of the 2015-2016 academic year, Dye's department held thirteen meetings, each lasting about an hour and a half, and held one graduation, General Assembly, and Convocation. [R. 40 p. 12; R. 53 pp. 16-17] While the time spent at these meetings and events was not negligible, it amounts to only a small fraction of the time spent performing other duties (i.e., teaching, meeting with students, grading, etc.).

Viewing this evidence in the light most favorable to Dye, the Court cannot conclude that no reasonable jury could find that in-person attendance at these meetings and events was "essential" and that removing this function would "fundamentally alter the position" of a tenured faculty member at TMU. For example, in *Kiphart v. Saturn Corp.*, 251 F.3d 573, 585 (6th Cir. 2001) the Sixth Circuit reversed a district court's finding that, as a matter of law, a certain function (strict adherence to a "job rotation system") was "essential" to the relevant position, even though the employer insisted it was. There was evidence in the record showing that "as a practical matter" not all other employees adhered to the system, the consequences of not following the system were not severe, and other employees who did not follow the system "still accomplished their assigned tasks." *Id.* Based on this evidence, the Court found that a reasonable jury could infer that removing the function from the position would not "fundamentally alter the

position." *Id.* The same is largely true here. Considering the evidence in the record, a reasonable jury could conclude that TMU got by just fine for "years and years" with faculty members not attending these meetings and events; that even now, in-person attendance, as a practical matter, was flexible—some meetings are more important than others, various exceptions were made and "excused" absences accepted, and faculty who missed the meetings could "casually" get caught up on what they missed, if they wanted to. But either way, the consequences were minimal. Further, the meetings and campus events occupied only a small portion of a faculty member's working time over the course of an academic year. All these facts weigh against a finding that in-person attendance is "essential." Of course, a reasonable jury could just as easily conclude that it is an essential function, based on TMU's judgment and the written description of a faculty member's duties, as well as evidence in the record concerning the important topics or decisions made at these meetings. But given the competing evidence, the Court cannot conclude, as a matter of law, that summary judgment on this issue is warranted.

TMU also argues that what Dye was actually requesting was an accommodation to be exempt from having to interact with her supervisor, Busse, and such an accommodation is unreasonable because working with a supervisor is an essential function. Thus, there are two related issues here: whether Dye could not perform an essential function of interacting with her supervisor and whether her requested accommodation was unreasonable.

There is certainly evidence that would suggest that Dye struggled to interact with or even avoided Busse. But there is countervailing evidence as well. For example, the record is replete with communications between Dye and Busse discussing various matters and Dye requesting or attempting to schedule meetings with Busse. [R. 32-1; R. 32-4; R. 32-6] Dean Jagger testified that, during this period when Dye was seeking an accommodation, "[Busse] and Kathy Dye had

24

conversations all the time" about various issues. [R. 42 p. 42] Indeed, the record supports that

Busse and Dye communicated and met frequently. Furthermore, in August 2016, Busse and Dye

participated in a mediation. [R. 29-1, pp. 59-60; R. 33-7] During this meeting, Dye agreed to

various proposed "solutions," such as calling Busse on the phone or stopping by her office to

discuss matters rather than communicating over e-mail, and she agreed to meet with Busse on a

"regular basis to allow a flow of communication about areas/topics in question and to discuss

expectations . . ." [R. 29-1, p. 60] Lastly, Dr. Davis (who examined Dye) testified in his

deposition that he was *not* indicating that "every time [Busse and Dye] met, they needed to have

a neutral third-party present," and he "did not believe she needed someone to be with her every

time she met with [Busse]." [R. 37 p. 30] In other words, a jury could find that Dye could

interact with Busse, and did so, despite the extreme anxiety it may have caused, and that her

disability only impacted her ability to attend the department meetings. Further, Dye's absences

from the departmental meetings also does not render her unqualified. The Sixth Circuit has

explained that "absenteeism that is unrelated to disability may indeed render a plaintiff

unqualified," but "[f]or purposes of the 'otherwise qualified' analysis, absenteeism that can be

cured with a reasonable accommodation is treated differently . . . we ask whether those absences

could have been avoided with reasonable accommodation" or "whether no reasonable

accommodation would cure them." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 418 (6th Cir.

2020).

Therefore, the next question is whether Dye's requested accommodation was

unreasonable. "The reasonableness of a proposed accommodation is a question of fact." *Fisher*,

951 F.3d at 419 (citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998)). But a

requested accommodation that removes an essential function from the position is *per se*

unreasonable. *Ford*, 782 F.3d at 761. Reasonable accommodations include "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held . . . is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position [to stay in the position]." *Rorrer*, 743 F.3d at 1039 (citing 29 C.F.R. § 1630.2(o)).

TMU argues that what Dye was really seeking was an accommodation that exempted her from Busse's supervision and that such an accommodation is *per se* unreasonable. Indeed, some courts have held that, for example, a "request for a different supervisor at a different location would not be considered reasonable" and an employee cannot use the ADA to "dictate who supervises [her]." *Summers v. Target Corp.*, 382 F. Supp. 3d 842, 849 (E.D. Wis. 2019); *Jordan v. Donahoe*, 2013 WL 3893532, at *10 (E.D. Va. 2013) ("[I]t is unreasonable as a matter of law for an employee to condition their return to work on their being transferred away from a particular supervisor. This demand is unreasonable, regardless of whether or not the supervisor is the cause of the employee's medical condition."); *Adams v. Alderson*, 723 F. Supp. 1531, 1532 (D.D.C. 1989) (holding a request for a different supervisor was unreasonable because an employer is "entitled to assign its personnel as the needs of its mission dictate."). But the record could support a finding that Dye was only seeking the narrow accommodation of not having to physically attend the departmental meetings (which, as already explained, is not necessarily an essential function) and not that Dye wanted to be exempt from all supervision by Busse.

Notably, Dye never requested a new supervisor. She only requested to not have to attend the department meetings and for mediated meetings to be held between her and Busse. Dr. Davis testified that he specifically remembered and put in his notes that he asked Dye "so what's the remedy to this situation, and she said that she should not have to attend those meetings. *She was*

*not asking for any other accommodation or relief.*" [R. 37 p. 25] He further explained that Dye

"was specifically asking to not have to interact with [Busse], *at least in that capacity, in those*

*meetings.*" [*Id.* p. 29] And so, the recommended mediated meetings were to help Dye's anxiety

to subside or become manageable. [*Id.*] Dr. Davis's medical examination report also supports his

deposition testimony. He noted that Dye's "request" was to be "excuse[d] . . . from departmental

meetings," if Dye was experiencing her anxiety and panic attacks, "for the next six months or

until the beginning of the next academic year." [R. 30 p. 7] And "[d]uring this period of

accommodation" the mediated meetings between Dye and Busse could "promote frank yet

collegial understanding of the problems between them and potential resolutions." [*Id.*]

 Because a jury could find that attending the department meetings and campus events is

not an "essential function," the Court cannot conclude that this aspect of Dye's requested

accommodation is *per se* unreasonable. To the extent TMU argues Dye's requested mediation

was also unreasonable, the Court notes that this type of accommodation is very different from

those described in the cases cited by TMU where an employee seeks to entirely replace his or her

supervisor or avoid supervision entirely. Further, a reasonable jury could conclude that Dye was

requesting *more* interaction with her supervisor, through mediated meetings, to improve the

relationship, despite the anxiety Busse caused. The EEOC's *Enforcement Guidance on the ADA*

*and Psychiatric Disabilities*[13] provides that "adjusting supervisory methods" is a "form of

reasonable accommodation" that employers may be required to provide, as well as providing

"additional training" or even a "job coach." One example provided by the EEOC explained that a

---

[13] Available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-ada-and-psychiatric-disabilities.
"The EEOC Enforcement Guidance while nonbinding constitutes a body of experience and informed judgment to
which courts and litigants may properly resort for guidance." *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809,
815 (6th Cir. 2012) (cleaned up) (citing *AT & T Corp. v. Hulteen,* 556 U.S. 701, 723 n. 5 (2009)). The Sixth Circuit
has "reaffirmed that the EEOC Enforcement Guidance is 'very persuasive authority' in questions of statutory
interpretation of the ADA." *Id.*

supervisor and employee may "work out a long-term plan to initiate weekly meetings" that could assist the employee in overcoming barriers caused by a psychiatric disability. *Id.* Such examples are not too different from requesting mediation to overcome barriers in a relationship between a supervisor and employee that have been caused by a disability. Therefore, the Court cannot conclude, as a matter of law, that requesting mediated meetings to *improve* interactions between an employee and supervisor is *per se* unreasonable. Considering this evidence, there is at least a genuine dispute over whether Dye was qualified and whether her requested accommodations were reasonable.

"[T]he burden of making out a prima facie case is not an onerous one," and the Court finds that Dye has done so. *Hostettler*, 895 F.3d at 855. Therefore, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *O'Donnell*, 833 F. App'x at 614. But TMU decided not to do so, explaining in a footnote that since Dye "failed to state a prima facie case for her failure to accommodate claim . . . it therefore is unnecessary to engage in an undue hardship analysis." [R. 36-1 p. 17-18 n. 2] But just in case TMU's gamble did not work out in its favor, it included a single throwaway argument that "Plaintiff's request to be totally exempted from an explicitly required and affirmative contractual duty by which all TMU faculty were bound would, for this reason alone (and among others), amount to an undue hardship under the applicable law," but failed to cite any authority in support of this argument. [*Id.*] Additionally, if TMU were correct, then an employer could claim "undue hardship" by simply making any function a "contractual duty," and avoid its obligations under the ADA entirely, but such an easy escape route does not exist. *E.g.*, *Rorrer*, 743 F.3d at 1039 (explaining that an employer cannot "avoid the clear congressional mandate that employers make reasonable accommodations" by simply "asserting that the

function is essential[.]"); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003)

("[A]n employer may not turn every condition of employment which it elects to adopt into a job

function, let alone an essential job function, merely by including it in a job description."). "[I]f

the employer claims that a proposed accommodation will impose an undue hardship, the

employer must prove that fact," and TMU has not. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d

1173, 1184 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition

Corp.*, 681 F.3d 312 (6th Cir. 2012). Because the "burden is on [TMU] to present fact-specific

evidence of hardship, and it has not done so," the Court will deny TMU's Motion for Summary

Judgment with respect to Dye's failure to accommodate claim. *Fisher*, 951 F.3d at 421.

### B. Failure to Engage in the Interactive Process

"When an employee with a disability requests an accommodation, the ADA mandates

that an employer must engage in an 'individualized inquiry' based on an 'interactive process'" to

identify the precise limitations resulting from the disability and potential reasonable

accommodations that could overcome these limitations. *O'Donnell*, 833 F. App'x at 617 (citing

29 C.F.R. § 1630.2(o)(3) and *Rorrer*, 743 F.3d at 1040); *Kirilenko-Ison v. Bd. of Educ. of

Danville*, 974 F.3d 652, 669 (6th Cir. 2020) ("Even though the interactive process is not

described in the statute's text, the interactive process is mandatory, and both parties have a duty

to participate in good faith."). The employer's "duty to engage in an interactive process" is

triggered "[o]nce an employee requests an accommodation." *O'Donnell*, 833 F. App'x at 617;

*Hostettler*, 895 F.3d at 857. "A request for a reasonable accommodation need not include 'magic

words,' like accommodation, disability, or ADA, but the request must be tied to plaintiff's

existing medical restrictions." *Flynn v. Intelligrated Servs., LLC*, No. 3:20-CV-00019-GFVT,

2021 WL 899082, at *3 (E.D. Ky. Mar. 8, 2021) (citing *Smith v. Henderson*, 376 F.3d 529, 535

(6th Cir. 2004)). Failure to engage in this mandatory interactive process is an independent violation of the ADA "if the plaintiff establishes a prima facie showing that [she] proposed a reasonable accommodation." *Rorrer*, 743 F.3d at 1041. "[B]oth parties have a duty to participate in good faith" in the interactive process. *Kleiber*, 485 F.3d at 871. Once the employee proposes an initial accommodation, "the employer has the burden of showing how the accommodation would cause an undue hardship, but the employer is not required to propose a counter accommodation in order to participate in the interactive process in good faith"—though "proposing counter accommodations may be additional evidence of good faith." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010). If the interactive process was triggered but not successfully resolved, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Kleiber*, 485 F.3d at 871 (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

TMU points to the numerous communications over email and in-person meetings between Dye, Busse, Dean Jagger, and Custer as evidence that TMU engaged in this mandatory interactive process. [R. 36-1 pp. 19-20] Indeed, "[a]n employee's request for reasonable accommodation requires a great deal of communication between the employee and employer." *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996). Nevertheless, TMU had a "continuing mandatory duty of good-faith participation in the interactive process," and, if after months of good faith participation, there is a "breakdown" that TMU is responsible for, then TMU will be liable. *Fisher*, 951 F.3d at 422. For example, in *Fisher* the Sixth Circuit explained that initially the employer "was participating in the interactive process in good faith," and even provided some accommodations, but once the employee's "repeated absences demonstrated" that the employee needed further accommodation, this triggered the employer's

duty to *continue* the interactive process, but the employer didn't. *Id.* Thus, "a factfinder could conclude that [the employer] bears the responsibility for its failure to respond to [the employee's] renewed requests for accommodation." *Id.* Accordingly, the employer was not entitled to summary judgment on the interactive process claim.

On May 10, TMU finally granted Dye two accommodations: she could call into departments meetings rather than attend in-person, for a limited period of time, and she could schedule mediations with Busse to work on their professional relationship. [R. 32-40 p. 3] When graduation, General Assembly, and Convocation came around, Dye provided various doctor's notes asking that she be excused from these events, either because she was "still experiencing the symptoms identified in Dr. Davis' evaluation," or because she was taking a new medication for her anxiety. A reasonably jury could certainly find that these notes renewed TMU's obligation to re-engage in the interactive process—especially in light of TMU's knowledge regarding Dye's medical condition at this point—but TMU instead refused to "excuse" her absences and used them as grounds for terminating Dye's employment. In other words, considering the record evidence in a light most favorable to Dye, a jury could conclude that TMU eventually tired of the "interactive process" and proceeded to discharge Dye rather than engage in further discussions. Indeed, Dean Jagger essentially said so in her deposition, suggesting that normally a faculty member would probably not be dismissed for missing these campus events, but they had been "going through a yearlong process to try to work with Kathy . . . we were trying to work with her, figure out ways that she could accomplish her job responsibilities," but Dean Jagger felt that "we weren't making any progress" and when Dye missed these events, it was "the final straw." [R. 42 p. 208] Therefore, the Court will deny TMU's Motion for Summary Judgment on Dye's interactive process claim.

### C. Discriminatory Discharge

As previously explained, when a failure to accommodate "leads to discharge for performance inadequacies resulting from the disabilities," this is considered direct evidence of discharge "because of" an employee's disability, in violation of the ADA. *McPherson*, 119 F.3d at 460. This is because failing to provide a protected employee a reasonable accommodation constitutes direct evidence of discrimination. *Kleiber*, 485 F.3d at 868. Thus, "a company may not illegitimately deny an employee a reasonable accommodation to a general policy and use that same policy as a neutral basis for firing [her]." *Dolgencorp*, 899 F.3d at 435. The Sixth Circuit illustrated this point by describing "a school that lacked an elevator" and fails to "accommodate a teacher with mobility problems." *Id.* The school "could not refuse to assign him to classrooms on the first floor, then turn around and fire him for being late to class after he took too long to climb the stairs between periods." *Id.*

Here, TMU has been clear before and during litigation that Dye's employment was terminated because of her attendance issues at department meetings and campus events. If TMU failed to provide a reasonable accommodation for Dye's disability with respect to these meetings and events, then TMU cannot turn around and fire Dye for failing to attend. Of course, a jury could conclude that Dye was not qualified for her position or that her requested accommodation was not reasonable, and so TMU refusing the accommodation would no longer be direct evidence of discrimination. But given the competing evidence, summary judgment on Dye's discriminatory discharge claim is inappropriate at this time.

### D. Breach of Contract

In count five of Dye's Complaint, she alleges that TMU breached her employment contract by failing to follow the termination procedures required by the contract. [R. 1 pp. 11-12]

In TMU's Motion for Summary Judgment, it also moved for summary judgment on Dye's breach of contract claim, arguing that there is no evidence in the record that Dye's employment contract was breached. [R. 36-1 p. 24] Dye, in turn, has moved for summary judgment on the liability portion of her breach of contract claim. [R. 50-1]

Under Kentucky law, to prove a breach of contract claim, a plaintiff must show: (1) the parties had a contract; (2) defendant breached that contract; and (3) the breach caused damage to the plaintiff. *EOT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. App. 2019). TMU only disputes Dye's argument that it breached the contract.

Under Kentucky law, the "construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003). In analyzing a breach of contract claim, the Court "must begin with an examination of the plain language of the instrument." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). An unambiguous contract will be enforced strictly according to its terms by assigning the contract's language its ordinary meaning and without resort to extrinsic evidence. *Frear*, 103 S.W.3d at 106. Thus, "[w]hen no ambiguity exists in the contract" the Court must "look only as far as the four corners of the document to determine the parties' intentions." *Kentucky Shakespeare Festival*, 490 S.W.3d at 695.

On the other hand, "if a reasonable person would find [the contract] susceptible to different or inconsistent interpretations," then it is ambiguous. *Hazard Coal Corporation v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (quoting *Cantrell Supply Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002)); *Central Bank & Trust Co. v. Kincaid,* Ky., 617 S.W.2d 32, 33 (1981) ("An ambiguous contract is one capable of more than one different, reasonable interpretation."). Nevertheless, "[t]he fact that one party may have intended different results,

however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Abney v. Nationwide Mutual Insurance Company*, 215 S.W.3d 699, 703 (Ky. 2006). "Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Id.* However, if the contract is ambiguous and there are material disputes concerning the extrinsic evidence, these factual issues are "subject to resolution by the fact-finder" *Id.*; *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006) ("Certainly, if the writing is ambiguous, the factual question of what the parties intended is for the jury to decide.").

Courts have often held that an employer must follow the termination policies within its employment contracts or else it is a breach of contract. For example, in *Scheib v. Commonwealth Anesthesia, P.S.C.*, No. 2010-CA-000781-MR, 2011 WL 5008089, at *4 (Ky. App. Oct. 21, 2011) the Kentucky Court of Appeals held that the plaintiff's employment contract required the employer to give the plaintiff written notice at least 120 days in advance of termination. Even though the employee had *actual* notice 120 days in advance, the Court of Appeals explained that the employee's contract contained "a specific provision . . . requiring that the notice be given in writing," and because "a written instrument will be strictly enforced according to its terms," the employer's failure to give *written* notice was a breach of contract. Similarly, in *Branham v. Thomas M. Cooley L. Sch.*, 689 F.3d 558, 565 (6th Cir. 2012) the Sixth Circuit affirmed the district court's finding that the defendant university breached the employment contract it had with the plaintiff (a tenured professor) because the contract "provided for a process governing the method by which she could be terminated" and the university "did not comply with that process." *See also McConnell v. Howard Univ.*, 818 F.2d 58, 67 (D.C. Cir. 1987) (explaining

34

that because "the power to terminate the appointment of a tenured faculty member is subject to procedures set forth in the Faculty Handbook," any failure to follow these procedures "would place [the] University in violation of its contract with [plaintiff]."); *Chan v. Miami Univ.*, 652 N.E.2d 644, 650 (Ohio 1995) ("Because the university terminated [plaintiff's] contract without complying with its express procedure for termination of tenured faculty, the university breached its contract with [plaintiff]").

At the time of Dye's termination, she had a contract for full-time employment with TMU as a tenured professor. [R. 32-37] As relevant here, the contract provided that "[s]hould termination of this agreement be desired by the College, the procedures to be followed will be found in the College's policies on Faculty Tenure and Dismissal." [*Id.*] Both parties agree that these policies are found in the Faculty Policy Manual [R. 33-37]. Further, TMU maintained a "Faculty Constitution" which detailed the "rights and responsibilities of the faculty members" and includes "the right not to be removed from his/her position except in accordance with established procedures." [R. 33-36][14] Furthermore, in Kentucky, a contract that is terminable only "for cause"[15] and "in accordance with the policies and procedures of the company" is an enforceable contract. *Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 492 (Ky. 1983). Employers and employees are "equally free to contract against discharge without cause" and such a contract is generally "terminable only pursuant to its express terms." *Id.* Therefore, Dye's contract is enforceable and may only be terminated according to its terms.

---

[14] Dye's employment contract also included references to the "policy of the College as expressed in the *Faculty Policy Manual* and *Faculty Constitution*" among "other official documents," [R. 32-37], and the Faculty Policy Manual repeatedly references and incorporates the Faculty Constitution. [R. 33-37]

[15] A "for cause" employment contract is in contrast to the ordinary "at-will" employment where "an employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983).

### 1. Termination Procedures

The Faculty Policy Manual outlines the "Dismissal Procedures" to be used to terminate the employment of a tenured faculty member. [R. 33-37 pp. 52-57; R. 34-26 p. 7][16] Under Section 1600, the Manual provides that the faculty member's "contract of employment is a bilateral obligation, and both faculty and the College shall adhere to proper procedures in its termination." [R. 33-37 p. 53] It further states that "[s]ubject to due process as outlined by AAUP,[17] the College reserves the right to terminate a contract of a tenured faculty member or a non-tenured faculty member during the term of his/her contract if such faculty member . . . is in violation of his/her contractual responsibilities . . ." [*Id.* at p. 54] Similarly, under Section 1400, the Manual provides that a tenured faculty member:

> [M]ay continue in the rank to which he/she has been appointed with tenure, or at a higher rank, until retirement, unless the College finds it necessary, *after due process*, to invoke its right to terminate the association at an earlier date on the basis of proof of adequate cause for dismissal, which will be related, directly and substantially, to the fitness or performance of the faculty member in his/her professional capacity as a teacher or creative member of his/her professional field.

[*Id.* at 45 (emphasis added)] Therefore, it is clear that TMU was contractually obligated to follow the "proper procedures" in terminating Dye's contract, and although TMU retains the ultimate right to terminate Dye's employment, that right is subject to "due process" and Dye's corresponding "right not to be removed from [her] position except in accordance with established procedures." [R. 33-36]

Under Section 1650 (titled "Dismissal Procedures") the Manual outlines the process by which a tenured faculty member's employment (whose term appointment has not expired) may be terminated. [R. 33-37 at pp. 54-58] Initially, when there is reason to question a faculty

---

[16] For unknown reasons, the Faculty Policy Manual in the record at R. 33-37 appears to be the entire Manual, absent the last page of Section 1650 (page 58). A copy of page 58 is available in the record at R. 34-26 at p. 7.
[17] The AAUP is the American Association of University Professors. [R. 33-37 p. 8]

member's "fitness" for continued employment, certain administrators should attempt to resolve the matter with the faculty member in a "personal conference." [*Id.* at p. 55] If that fails and the university president believes dismissal proceedings are warranted, "such action shall be commenced under the procedures" outlined in the Manual. [*Id.*] First, the university president and the "appropriate administrative officers" must "jointly formulate[]" a "statement detailing the grounds proposed for the dismissal[.]" [*Id.*] That statement is sent to the faculty member and she is informed that she can request "a hearing to determine whether [she] should be removed from [her] faculty position on the grounds stated[.]" [*Id.* p. 56] The faculty member must be given "sufficient time" to "prepare a defense" and must submit a written answer, responding to the president's statement detailing the grounds that warrant dismissal. [*Id.*] A hearing is scheduled, a "hearing committee" of other faculty members is formed, and the hearing is held. [*Id.* pp. 56-57] The faculty hearing committee must consider "the statement of grounds for dismissal already formulated, and the faculty member's response written before the time of the hearing." [*Id.* at p. 56] "If any facts are in dispute, the testimony of witnesses and other evidence concerning the matter set forth in the President's letter to the faculty member shall be received." [*Id.* at p. 57] The hearing committee must then issue a decision "on the basis of the hearing," and it must make "explicit findings with respect to each of the grounds of removal," with a copy of the decision sent to the president and faculty member. [*Id.*]

Following the hearing committee's decision, under subsection 1650.5 (titled "Appeal to the Board of Trustees"), the Manual provides that "[i]n the event the action taken is dismissal, the faculty member may appeal that action to a panel of the Executive Committee of the Board of Trustees," and the hearing committee's decision will then either be "sustained" or "remanded . . . with specific instructions." [*Id.* p. 5] If remanded, the faculty hearing committee must

"reconsider" its decision, "taking into account the stated objections and receiving new evidence if necessary." [*Id.*] Following reconsideration, the Board of Trustee's panel will then make a "final decision." [*Id.*] Notably, subsection 1650.5 of the Manual is silent on what (if any) appeal process exists for when the faculty hearing committee's decision is *against* dismissal.

### 2. Termination of Dye's Contract

The facts surrounding the termination proceedings of Dye's dismissal are not disputed and, as the record reflects, TMU initially followed the basic outlines of the required procedures. Various administrators attempted to informally resolve TMU's problems with Dye, but when that failed, the matter was referred to TMU's president (Mr. Armstrong) by Dean Jagger, the Vice President for Academic Affairs. Dean Jagger sent a letter to Dye outlining the "ongoing serious issues related to [Dye's] workplace conduct" such as not attending department meetings and failing to attend various campus events, and referring the matter to President Armstrong. [R. 33-12] President Armstrong subsequently sent a letter outlining the specific grounds on which the administration sought Dye's dismissal. [R. 33-14] The letter highlighted four events that Dye failed to attend.[18] [*Id.*] A faculty hearing committee was formed, the hearing was held, and the hearing committee issued a unanimous decision in opposition to terminating Dye's employment. [R. 33-18] "The committee found that there is insufficient evidence to justify termination for cause for the explicitly stated reasons given in the letter from President Armstrong to Dr. Dye[.]" [*Id.*] However, the committee agreed that "Dye's actions in other areas not stated in the termination letter from President Armstrong" warranted "corrective and progressive disciplinary action." [*Id.* p. 2] Following this decision, President Armstrong sent a letter to the Board of Trustees, purporting to "appeal" the hearing committee's decision under "the appeal procedure

---

[18] Graduation on May 14, 2016; General Assembly on August 11, 2016; the department meeting on August 11, 2016; and Convocation on August 13, 2016.

of Section 1650 of the Faculty Policy Manual[.]" [R. 33-19] A "Review Panel" was formed by the Board of Trustees to review the hearing committee's decision and following review, the panel voted to "remand" the decision with directions that the hearing committee reconsider its decision and address other evidence and performance issues that the panel believed the hearing committee had not sufficiently considered as potential grounds for termination. [R. 33-22] The faculty hearing committee responded, explaining that it "did consider all the evidence presented because it was clear at the hearing that the College had many additional concerns beyond the absenteeism charges" and that the hearing committee specifically voted on whether the various performance issues warranted dismissal, finding that they did not. [R. 33-23] Following the hearing committee's response, the panel met again and issued a "final decision," concluding that "the facts warrant the termination of Dr. Dye." [R. 33-24] Based on the panel's final decision, TMU terminated Dye's employment. [R. 33-25]

In support of her Motion for Summary Judgment on her breach of contract claim, Dye makes two arguments: 1) that President Armstrong's "statement detailing the grounds proposed for the dismissal" was insufficient to comply with the requirements of the Manual, and 2) under the terms of the Manual, TMU does not have a corresponding right to appeal to the Board of Trustees when the hearing committee's decision is *against* dismissal.

### i. President Armstrong's Detailed Statement

On September 2, 2016, President Armstrong sent Dye a letter informing her that he was recommending that her employment be terminated and that "this letter sets forth the statement detailing the grounds proposed for your dismissal" and notified her of the "commencement of formal proceedings." [R. 33-14]

Under the termination procedures outlined in the Manual, this "detailed statement" written by the university president provides a framework for the dismissal proceedings. It must be a "statement detailing the grounds proposed for the dismissal," sent to the faculty member so he or she can "prepare a defense" and request "a hearing to determine whether [she] should be removed from [her] faculty position *on the grounds stated*" in the president's letter. [R. 33-37 p. 55 (emphasis added)] The faculty member must submit a written "answer . . . [to] the statements in the President's letter." [*Id.*] During the hearing, the faculty committee must consider "the statement of grounds for dismissal already formulated, and the faculty member's [written] response" as well as "the testimony of witnesses and other evidence concerning the matter set forth in the President's letter[.]" [*Id.*] The hearing committee must then issue a decision, making "explicit findings with respect to each of the grounds of removal" listed in the president's letter. [*Id.* p. 56]

Dye argues that President Armstrong's letter failed to sufficiently "detail" all the grounds for dismissal that TMU was relying on to terminate her employment, thus failing to give her the notice required under the Manual. President Armstrong's letter only states four specific instances of Dye failing to perform her duties as a professor and TMU employee—her absence from the August 11th department meeting and the three campus events. [R. 33-14] Nevertheless, during the faculty hearing committee, President Armstrong introduced multiple other grounds for Dye's termination (i.e., issues with communication, teamwork, timeliness, insubordination, etc.), the hearing committee considered these additional grounds for dismissal, and the Board of Trustees Review Panel relied, at least in part, on these additional grounds to support its decision. [R. 33-24] Therefore, according to Dye, TMU breached its contract by failing to provide her with

adequate notice before the hearing and dismissing her on grounds not "detailed" in President Armstrong's letter.

TMU argues that Dye received proper notice for the reasons of her termination, as required by the Manual, because President Armstrong's letter explicitly informed Dye that it "incorporate[d] by reference all details of the August 22, 2016, letter" she received from Dean Jagger. [R. 33-14] Further, President Armstrong's letter referenced the May 10, 2016 meeting between Dean Jagger and Dye regarding "workplace performance issues" and Dye's failure to perform all the duties of her employment contract. [R. 54 at p. 2] The August 22 letter from Dean Jagger that was "incorporated" into President Armstrong's letter described in greater detail the issues surrounding Dye's absence from the department meetings and campus events, but does not specifically mention any other issues TMU ultimately relied on for Dye's dismissal (communication, teamwork, timeliness, etc.) [R. 33-12] However, a memorandum from the referenced May 10 meeting does show that Dye, Dean Jagger, and others discussed issues of insubordination, collegiality, communication, "fulfillment of professional responsibilities," and related issues. [R. 32-40] TMU argues that President Armstrong's reference to this meeting[19] sufficiently incorporated the issues discussed in that meeting and put Dye on notice that those issues were a part of her upcoming termination proceedings.

Upon examination of the pertinent language, the Court finds that the Manual clearly outlines a procedure by which the President's statement "detailing the grounds" for removal will guide the dismissal proceedings. Although the outer bounds of just how "detailed" the statement must be is undefined, at a minimum, the Manual requires the President's statement to detail all

---

[19] President Armstrong's letter, in its introductory paragraphs, stated "As you know, on May 10, 2016, you met with Kathleen Jagger and other appropriate administrative officials to discuss workplace performance issues surrounding the neglect of or refusal to uphold the obligations of your employment contract. . . ." [R. 33-14]

the grounds for dismissal. President Armstrong's letter merely mentioning a meeting (where communication, insubordination, and other issues had been discussed) does not "detail" those issues as grounds for dismissal. Instead, President Armstrong's letter is clear that the grounds for dismissal were Dye's failure to attend graduation, General Assembly, the August 11th department meeting, and Convocation. [R. 33-14] And while Dye may have reasonably assumed or even believed that issues surrounding alleged insubordination and communication would also be brought up during her hearing, that is not sufficient to comply with the Manual's requirements. Such a situation is similar to *Scheib v. Commonwealth Anesthesia*. As previously explained, there the Kentucky Court of Appeals held that the contract required *written* notice in advance of termination, and even though the employee had actual notice the contract contained "a specific provision . . . requiring that the notice be given in writing," and this would be "strictly enforced according to its terms." *Scheib*, 2011 WL 5008089, at *4. Accordingly, the employer's failure to give written notice was a breach of contract. The same is true here. Furthermore, as the Court explains below, even if President Armstrong's insufficient letter does not amount to a breach of contract, TMU breached by other means.

### ii. TMU's Appeal of the Hearing Committee's Decision

Dye also contends that the Manual only gives faculty members the right to appeal the faculty hearing committee's decision, and TMU went outside of the terms of the Manual and "appealed" anyway, terminating her employment through a process outside of and contrary to the Manual's procedures.

Dye is correct that the Manual is silent on whether the university may appeal the decision of the faculty hearing committee. Indeed, the subsection 1650.5 on "Appeal to the Board of Trustees" only provides an appeal process for a faculty member "[i]n the event the action taken

42

is dismissal[.]" [R. 33-37 p. 57] TMU argues that the Manual gives TMU a right to appeal the faculty hearing committee's decision elsewhere, citing to subsection 1650.8 of the Manual, entitled "Salary for Dismissed Faculty member" which states the following:

> If in accordance with these procedures, the final decision by the Board of Trustees is for dismissal, either by acceptance of the hearing committee's decision or by overruling the committee, the faculty member shall receive his/her salary for three months from the date of that decision or an established date of dismissal if later, unless he/she obtains employment elsewhere sooner.

[R. 34-26 p. 7] TMU argues that the language "[if] the final decision by the Board of Trustees is for dismissal . . . by overruling the committee" contemplates a scenario where the faculty hearing committee decides against dismissal, the university appeals that decision to the Board of Trustees, and the Board's final decision "is for dismissal . . . by overruling the committee." [R. 54 p. 4] Why TMU or its faculty would hide TMU's "right to appeal" in such language, within the section concerning "Salary for Dismissed Faculty member" is unexplained by TMU and is puzzling, to say the least.

Dye argues that TMU's strained interpretation of subsection 1650.8 is inconsistent with the Manual's other sections providing a right to appeal only to faculty members. Further, to explain the language in subsection 1650.8, Dye contends that the Board of Trustees could reach a final decision by "overruling the committee," not when the university appeals, but where the hearing committee rules in favor of dismissal, triggering the faculty member's appeal, the Board of Trustees remands to the hearing committee to consider additional evidence, prompting the hearing committee to reconsider and decide against dismissal, but the Board of Trustees then overrules the hearing committee's decision on reconsideration. While such a process appears somewhat convoluted, it is more consistent with the terms of the Manual than TMU's interpretation.

43

TMU also argues that Section 1401 of the Manual gives "the College" the right to "terminate" the employment of a tenured professor, *not* the faculty hearing committee. [R. 54 at p. 8] However, the cited section of the Manual makes clear that a tenured professor may continue in employment until retirement, "unless the College finds it necessary, *after due process*, to invoke its right to terminate the association at an earlier date on the basis of proof of *adequate cause for dismissal . . . .*" [R. 33-37 at 45] Further, Dye's contract is clear that if "the College" wants to exercise its right to terminate the contract, it must follow the procedures "found in the College's policies on Faculty Tenure and Dismissal" (i.e., the Manual). [R. 32-37] In other words, TMU has the ultimate "right to terminate" a tenured professor, but its right is not unlimited and may only be exercised by following the established procedures. *See Restatement of Employment Law* § 2.05 (2015) ("Policy statements by an employer . . . [that] establish limits on the employer's power to terminate the employment relationship[] are binding on the employer until modified or revoked.").

Here, the relevant language is silent on whether TMU could "appeal" the hearing committee's decision against termination. It does not explicitly include or exclude such a right. However, as previously explained, the contract does address the rights to appeal. It expressly provides that "[i]n the event the action taken is dismissal, the faculty member may appeal that action to a panel" of the Board of Trustees. [R. 33-37 p. 58] The Kentucky Supreme Court has explained that "Kentucky has long adhered to the rule *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of another") in interpreting both statutes and contracts." *Madding v. Com.*, No. 2001-SC-0570-MR, 2003 WL 22415625, at *5 (Ky. Oct. 23, 2003) (citing *Burgin v. Forbes*, 293 Ky. 456, 169 S.W.2d 321, 325 (1943); *Fiscal Court v. Brady, Ky.*, 885 S.W.2d 681, 685 (1994), and *Wade v. Commonwealth*, Ky., 303 S.W.2d 905, 907 (1957)). And

this "maxim" is "often used as an aid in arriving at the intention of the parties to a contract." *Parrish v. Newbury*, 279 S.W.2d 229, 233 (Ky. 1955). Applying that rule of construction here, the relevant language in Dye's contract is unambiguous. The Manual provides a right to appeal only to a faculty member and only "in the event the action taken [by the hearing committee] is dismissal," with no corresponding right to the university in the event that the hearing committee decides against dismissal. [R. 33-37 p. 58] And Kentucky law is clear that "nothing can be added to or taken from a written contract" that is otherwise clear. *New Life Cleaners v. Tuttle*, 292 S.W.3d 318, 322 (Ky. Ct. App. 2009). Further, it is not absurd or unreasonable that a university and its faculty could agree that a prerequisite to termination is for a majority of other tenured faculty members (selected for a hearing committee) must also agree that termination is warranted. It may be that, in retrospect, TMU "intended different results," but that alone "is insufficient to construe a contract at variance with its plain and unambiguous terms." *Abney*, 215 S.W.3d at 703. And while TMU may believe that such an outcome is unfair, the Court is "not permitted to create an ambiguity where none exists even if doing so would result in a more palatable outcome." *New Life Cleaners*, 292 S.W.3d at 322. Accordingly, the Court finds that, based on the undisputed facts in the record, TMU breached Dye's employment contract.

### iii. TMU's Affirmative Defenses

In TMU's Answer, it asserted various affirmative defenses, including unclean hands and waiver. [R. 14 at 9] Dye moved for summary judgment on all of TMU's affirmative defenses, [R. 50-1 at 12] and TMU responded, opposing summary judgment only with respect to its affirmative defenses of waiver and unclean hands. [R. 54][20]

---

[20] Dye also moved for summary judgment on TMU's affirmative defense that Dye's "claims are barred by the after-acquired evidence doctrine." [R. 50-1] In its response TMU expressly stated it does not oppose Dye's motion as to the after-acquired evidence doctrine, estoppel, or laches defense. [R. 54]

TMU argues that Dye has "unclean hands" because she breached her employment contract first by not performing all her duties and she cannot now complain if TMU subsequently breached the contract by failing to follow the required termination procedures. [R. 54 p. 7] As an initial matter, there is some distinction in Kentucky between the "unclean hands" doctrine and the "first breach" doctrine that TMU is asserting.[21] As Dye points out in her response, the unclean hands doctrine is a rule of equity that precludes judicial relief for a party who has "engaged in fraudulent, illegal, or unconscionable conduct in connection with the matter in litigation." *Mullins v. Picklesimer*, 317 S.W.3d 569, 577 (Ky. 2010) (quoting *Suter v. Mazyck*, 226 S.W.3d 837, 843 (Ky. App. 2007)) (internal quotation omitted). However, it generally does not apply when "the plaintiff has engaged in conduct less offensive than that of the defendant." *Id.* In contrast, the first breach doctrine is that "the party first guilty of a breach of contract cannot complain if the other party thereafter refuses to perform." *Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956). Thus, if one party refuses to "perform the contract as written," then the other party has "the right to treat this action as a breach, to abandon the contract, and to depart from further performance[.]" *Id.*

TMU argues that because Dye "first breached" she "cannot now contend that TMU breached" the employment contract in the manner it terminated her employment. [R. 54 p. 7][22] As previously explained, under Kentucky law, a contract for employment that is terminable only "for cause" and "in accordance with the policies and procedures of the company" is enforceable

---

[21] Although this Court has previously suggested that the "first breach rule in Kentucky operates as a form of the 'clean hands' doctrine, barring all claims brought by the first breaching party," *ClubSpecialists Int'l, LLC v. Keeneland Ass'n, Inc.*, No. 5:16-CV-345-KKC, 2018 WL 2050134, at *3 (E.D. Ky. May 2, 2018), it is clear that although the two are similar, they are not identical.

[22] To the extent TMU is asserting the defense of "unclean hands," the Court notes that, under Kentucky law, the unclean hands doctrine is a rule of equity that is within the Court's discretion to apply, and the Court declines to apply the doctrine because TMU cites to no evidence and makes no substantive argument that Dye's conduct was "fraudulent, illegal, or unconscionable." *Mullins*, 317 S.W.3d at 577.

and such a contract is generally "terminable only pursuant to its express terms." *Shah*, 655 S.W.2d at 492. But TMU argues that since it had "cause" to terminate Dye's employment (due to her alleged breach of the employment contract), Dye cannot now insist that TMU follow the termination procedures outlined in the contract because Dye "breached first." Nevertheless, TMU's argument is without merit.

TMU's proposed application of the first breach doctrine would effectively eliminate an employer's contractual obligations to dismiss an employee only in accordance with the policies and procedures agreed to in the contract, making such protections meaningless. In other words, if an employer and employee agree to a contract requiring termination only for cause and in accordance with certain dismissal procedures, the employee's alleged breach of the contract— thus constituting the "cause" for dismissal—does not then free the employer from the dismissal requirements. The contract cannot be tossed aside, and the employee fired in whatever manner the employer desires, simply because the employer now has grounds for dismissal. And the Kentucky Court of Appeals shot down such an application of the "first breach" doctrine in *Absher v. Illinois Cent. R. Co.*, 371 S.W.2d 950, 954 (Ky. App. 1963). There, the state court of appeals explained the first breach rule from *Dalton v. Mullins* and concluded that the principle in that case should not "apply to a contract that expressly requires claimed defaults [under the contract] to be submitted to a stated remedial procedure. If it did, no person with a valid and substantial complaint ever would be required to assert it within the framework of the agreement." *Id.* Similarly, the Western District of Kentucky rejected such a sweeping application of the first breach doctrine in *Poynter v. Ocwen Loan Servicing, LLC*, No. 3:13-CV-773-DJH-CHL, 2017 WL 2779489, at *5 (W.D. Ky. June 27, 2017). There, the parties' contract contained a jury waiver clause, but the plaintiff argued that "the waiver should be unenforceable because the

defendants breached the [contract] first, and thus they 'cannot complain if the other party thereafter refuses to perform.'" *Id.* The district court explained that "this theory proves too much" and cited to a similar argument that was rejected by the Eleventh Circuit in *Cornett v. Carrithers*, 465 F. App'x 841, 844 (11th Cir. 2012).

As applied here, if the first breach rule excused an employer from following its termination policies, then those policies would not provide the intended procedural protections to any employee, rendering them useless. But "[i]n contract law, we presume that parties include contractual provisions and terms for a reason" and contracts should not be interpreted to render certain provisions meaningless. *Killion v. Commonwealth*, No. 2013-CA-000501-MR, 2014 WL 3021316, at *4 (Ky. App. July 3, 2014). Therefore, the Court rejects TMU's first breach defense.

Lastly, TMU argues that because Dye "did not object to the University's right to appeal the hearing committee decision at any time prior to the instant lawsuit being filed," she "waived" her right to bring a claim for breach of contract. However, TMU cites no caselaw or any record evidence and otherwise makes no effort to develop this argument. Further, under Kentucky law, "a waiver exists only where one with full knowledge of a material fact does or forbears to do something inconsistent with the existence of the right or of his intention to rely upon that right." *Harris Bros. Const. Co. v. Crider*, 497 S.W.2d 731, 733 (Ky. 1973). Even if Dye did not raise the argument before the Board of Trustees that TMU's "appeal" was illegitimate, it is unclear how that constituted a waiver of Dye's right to now sue for breach of contract, particularly when the Court finds that the appeal to the Board was impermissible under the contract. Therefore, TMU's waiver argument fails.

Accordingly, the Court will deny TMU's Motion for Summary Judgment and grant Dye's Motion for Partial Summary Judgment.

**IT IS ORDERED** as follows:

1.    Thomas More University's Motion for Summary Judgment [**R. 36**] is **DENIED**.

2.    Kathy Dye's Motion for Partial Summary Judgment [**R. 50**] is **GRANTED**.

This the 2nd day of September, 2021.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc:    Counsel of Record